## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

MANN BRACKEN, LLP       *
c/o Cheryl E. Róse, Esq.
12154 Darnestown Road, # 623    *
Gaithersburg, MD  20878
                    *

a/s/o AXIANT, LLC
9930 Kiney Avenue          *      Case No:
Huntsville, NC  28078
                    *

      Plaintiffs
                    *

v.                     *

EXECUTIVE RISK INDEMNITY, INC.    *
82 Hopmeadow Street
P.O. Box 129
Simsbury, Ct 06070         *

      Defendant         *

---

### COMPLAINT TO ENFORCE INSURANCE COVERAGE

Comes now Cheryl E. Rose, in her official capacity as Receiver of Mann Bracken, LLP ("Mann Bracken"), and as assignee of Axiant, LLC ("Axiant"), by and through undersigned counsel, as and for her complaint (the "Complaint") against Executive Risk Indemnity, Inc. ("ERII") as the insurer ("Insurer") of Axiant states as follows:

### THE PARTIES

1.     When it was operational, Mann Bracken's principal office was located at 702 King Farm Boulevard, Rockville, Maryland 20850.  Mann Bracken is currently in receivership.

2.     Mann Bracken was a limited liability partnership performing legal services, whose partners were lawyers who worked at the firm.

1

3.      Cheryl E. Rose is the Court-appointed Receiver for Mann Bracken, a Delaware Limited Liability Partnership that was qualified to do business in Maryland.

4.      Axiant is a Delaware Limited Liability Company with its former principal place of business in North Carolina.

5.      Axiant is the assignor of the insurance policy in issue to Mann Bracken.

6.      Axiant was a limited liability corporation and whose owners did not include the partners of Mann Bracken.

7.      Defendant ERII is a Delaware corporation that is qualified to do business in Maryland.  See Ex. 1.

8.      Chubb Corporation, also known as the Chubb Group of Insurance Companies, ("Chubb") provides various insurance products, directly and indirectly.

9.      Chubb is the sole owner of Federal Insurance Company ("Federal"). Ex. 2

10.     Federal owns a division known as "Chubb & Son." Ex. 2.

11.     Chubb & Son is the Claims Manager for ERII.  Ex. 2.

12.     ERII is a subsidiary of Chubb. Ex. 2.

## JURISDICTION AND VENUE

13.     Jurisdiction is proper in this Court pursuant to Sections 6-102 and 6-103 of the Courts and Judicial Proceedings Article.

14.     Venue is proper in this Court pursuant to Section 6-201 of the Courts and Judicial Proceedings Article.

## NATURE OF THE CASE

### Insurance Policy

15.     This action arises from ERII's failure to honor its insurance contractual obligations explicitly set forth in, or arising from, the policy issued to Axiant.

16.     ERII sold to Axiant a Professional Errors & Omissions Policy, Policy No. 8209-6996, for the policy period of February 12, 2009 through August 10, 2010 (the "Policy"). A true and correct copy of the Policy is attached hereto as Exhibit 3.

17.     The Policy provides coverage for any "Claim" first made against Axiant and reported during to ERII in writing during the policy period for "Wrongful Acts" committed by the Insureds solely in the performance of or failure to perform "Insured Services." See Ex. 3 at C33192, p. 5 of 14.

18.     The limit of liability under the Policy is Five Million Dollars ($5,000,000.00) for each claim and in the aggregate with a retention amount of Fifty Thousand Dollars ($50,000.00). Ex. 3 at C33192, p. 1 of 14.

19.     The costs of defense and liability from the underlying action discussed below is in excess of the retention amount of $50,000.00.

20.     "Claim" includes "a written demand for monetary damages or non-monetary relief," as well as "a civil proceeding commenced by the service of a complaint or a similar pleading." See Ex. 3 at C33192, p. 3 of 14.

21.     "Wrongful Act(s)" means "any actual or alleged negligent act, error or omission committed, attempted, or allegedly commitment or attempted, solely in the performance of or failure to perform Insured Services, by an Insured Organization or by an Insured Person acting in his or her capacity as such and on behalf of an Insured Organization." See Ex. 3 at C33192, p. 6 of 14.

22.     "Insured Services" are described as "Collection Agency," which is undefined in the Policy. See Ex. 3 at C33192, p. 1 of 14.

3

23.     The Policy further states that "Bankruptcy or insolvency of any Insured shall not relieve the Company of its obligations nor deprive the Company of its rights or defense under this Policy." See at C33192, p. 14 of 14.

24.     Upon information and belief, during the policy period, Axiant noticed ERII of the claim by Mann Bracken discussed in depth below.

25.     Axiant had complied with all the terms of the Policy including, but not limited to, payment of the Premium of One Hundred Ninety-nine Thousand and Three Hundred Ninety-nine Dollars ($199,399.00).

26.     None of the exclusions in the Policy bar coverage.

27.     To date, ERII has continued to deny coverage and refused to defend or indemnify Axiant for the claims brought by Mann Bracken.

**Relationship Between Axiant and Mann Bracken**

28.     Axiant provided collection services and recovery management solutions to various entities including Mann Bracken. Axiant routinely relied on the services of various attorneys to assist Axiant by instituting lawsuits against individuals and entities that had not honored their obligations to Axiant's clients (the "Axiant Clients"). Those attorneys provided legal services on Axiant Clients' behalf.

29.     Mann Bracken was a debt collection law firm located in Rockville, Maryland, which provided legal services necessary to collect debts on behalf of its clients ("MB Clients") and for Axiant Clients (together, the MB Clients and the Axiant Clients are referred to herein as the "Clients").

30.     Mann Bracken provided the majority of the legal collections work for the Clients.

31.     In the ordinary course of their provision of legal services on behalf of the

Clients, Mann Bracken relied upon Axiant as a collection agency that provided essential administrative services related to collection activities for the Clients.

32.    On April 4, 2008, Axiant and Mann Bracken entered into an Administrative Services Agreement (the "ASA").  See Ex. 4.

33.    On April 4, 2008, Axiant and Mann Bracken entered into a Legal Services Agreement ("LSA").  See Ex. 5.

34.    Under the ASA, Axiant acts as a "Collection Agency" by providing consumer debt collection support activities, including client management services, arbitration support services, collection software, and other related support activities together with all required administrative services (together, the "Collection Agency Services") so that Mann Bracken could perform its legal services for the Clients.

35.    Axiant made available to Mann Bracken the Axiant offices, personnel, facilities, equipment, software, and Collection Agency Services for the benefit of Mann Bracken and the Clients.

36.    In addition, Axiant maintained records and had access to Mann Bracken's funds in order to perform its work as a Collection Agency.

37.    The records maintained by Axiant on behalf of Mann Bracken include the accounts of Clients, as well as the payment history and other information about hundreds of thousands of account debtors of the Clients and other information maintained by Axiant.

38.    Under the ASA, Axiant was empowered to debit certain monies from Mann Bracken's accounts for the satisfaction of certain reoccurring and certain periodic expenses, including payment of Axiant's own management fees, so that Axiant could

maintain its operations as a Collection Agency and, simultaneously, Mann Bracken could provide its collection services to the Clients.

39.     Under the ASA, Axiant had access to all of Mann Bracken's demand accounts, and authority to debit funds therefrom so that Axiant could maintain its operations as a Collection Agency and, simultaneously, Mann Bracken could provide its collection services to the Clients.

40.     The business relationship between Axiant and Mann Bracken made Mann Bracken's operations wholly dependent upon Axiant's performance of the Collection Agency Services.

41.     Specifically, and without limitation, the ASA provided, "Axiant must perform such client management, bookkeeping and accounting services as are not performed by [Mann Bracken]'s personnel and are determined to be reasonably necessary for the proper and efficient operation of the Business of [Mann Bracken]."

42.     Connell Loftus, Esq., as managing partner of Mann Bracken, regularly met with Greg Petske, an Axiant employee who answered directly to the Chief Financial Officer of Axiant, with such meetings occurring, on average, once per month to review the financial affairs of Mann Bracken.

43.     During the aforementioned meetings, Mr. Loftus was regularly presented with written reports summarizing the financial position of Mann Bracken (the "Financial Reports").

44.     From approximately the Spring of 2008 through the Fall of 2009, the Financial Reports regularly reflected that Mann Bracken was indebted to Axiant under the terms of the ASA and other agreements governing the relationship between Mann

6

Bracken and Axiant as well as for the Collection Agency Services that Axiant provided to Mann Bracken, whether or not in conformance with the ASA.

45.     Regardless of compliance with the ASA, Axiant provided Collection Agency Services to Mann Bracken upon which Mann Bracken relied.

46.     The purported debt of Mann Bracken to Axiant reflected in the Financial Reports led Mann Bracken to proceed in a financially conservative manner, with no partner dividends ever being issued.

### Axiant Wrongful Acts

47.     On or about July 1, 2009, Mr. Loftus learned that Axiant had failed to repay Mann Bracken as much as Eight Million Eight Hundred Seventy Four Thousand Five Hundred Ninety Three Million Dollars ($8,874,593.00) in funds collected by Axiant from Mann Bracken's clients (the Unreimbursed Advanced Costs ("UACs")).

48.     Specifically, at various times in given matters, Mann Bracken would advance court costs and other related fees on behalf of the Clients to pay for Collection Agency Services.

49.     Following Mann Bracken's advancing such court costs and other related fees, Axiant would bill the Clients pursuant to the terms of the ASA and the LSA or other contracts, directly, or indirectly, with the Clients for reimbursement of the advances.

50.     Mann Bracken has never received payment for the value of the UACs from Axiant or otherwise.

51.     Axiant expressly represented in its Bankruptcy Schedules filed under penalty of perjury in the Bankruptcy Case (Docket No. 165, Sched. F, at 30) that it owed Mann Bracken Eight Million Eight Hundred Seventy Four Thousand Five Hundred

Ninety Three Dollars ($8,874,593.00), and implicitly that the amount of the claim was non-contingent, liquidated and undisputed.

52.    Axiant requested that Mann Bracken work with Axiant to enable a sale that may enable Axiant and Mann Bracken to continue operations.

53.    As a result of these conversations, Mann Bracken did not commence any collection efforts against Axiant for its negligent performance of the Collection Agency Services.

### Axiant Bankruptcy Proceeding/Mann Bracken Receivership

54.    On November 20, 2009, Axiant filed a voluntary petition ("Axiant Bankruptcy Proceeding") for relief under Chapter 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"), Case No. 09-14118 (MFW).

55.    As a result of the bankruptcy filing, Mann Bracken's collection efforts against Axiant outside of bankruptcy were stayed by 11 U.S.C. §362.

56.    Mann Bracken filed a proof of claim for $8,874,593.00 in the Axiant Bankruptcy Proceeding for the amount acknowledged by Axiant in its bankruptcy schedules to be owed to Mann Bracken.

57.    Without the funds taken by Axiant and with significant funds owed from Clients who were overdue in payments, and with Axiant unable to continue providing Collection Agency Services in the ordinary course of business to Mann Bracken and the Clients, Mann Bracken could not maintain operations.  Mann Bracken ceased operations in early December, 2009.

58.    Upon information and belief, on or about December 21, 2009, Mann Bracken sent a letter notifying Axiant's insurer of Mann Bracken's claim for damages in

excess of $6,000,000.00 due to Axiant's failure to properly provide Collection Agency Services.

59.     On December 28, 2009, the Bankruptcy Court converted the Axiant Bankruptcy Proceeding to a case under Chapter 7 of the Bankruptcy Code and appointed the Trustee as the Chapter 7 Trustee for Axiant's bankruptcy estate (the "Axiant Estate"), which appointment remains in effect.

60.     On February 27, 2010, the Circuit Court for Montgomery County, Maryland ("Receivership Court") appointed Cheryl E. Rose as the receiver for Mann Bracken (the "Receiver") in this proceeding ("Receivership Action") in Case No. 327646-V before the Honorable Ronald B. Rubin.

61.     The Order Appointing Receiver grants the Receiver various powers with regard to the affairs of Mann Bracken, including the right to "participate in lawsuits and other actions where [Mann Bracken] is a participant," to "consent to judgments lawsuits [sic] or actions as the Receiver determines using her business judgment," and to "[c]ompromise any litigation to which [Mann Bracken] is a party consistent with the purposes of maximizing the recovery for [Mann Bracken] and maximizing distributions to the creditors of [Mann Bracken]."  Order Appointing Receiver at pp. 3-4, §§(j), (l).

62.     On December 4, 2013, the Bankruptcy Court entered the Order Granting Cheryl E. Rose, Receiver for Mann Bracken, LLP Relief from the Automatic Stay to Proceed Against the Estate of the Debtor to Recover Available Insurance Proceeds (DE 804) (Ex. 7.)  This Order enabled the Receiver to pursue claims against Axiant and enforce any successful claims to the limited extent they might be satisfied in whole or in part by Axiant's insurance policies and not otherwise by assets of the Axiant Estate.

63.    The Receiver has reviewed all motions to modify the automatic stay filed against Axiant in the Bankruptcy Case and does not see where any other creditors have sought permission to modify the automatic stay to commence a lawsuit against Axiant and/or to pursue claims against Axiant's insurer.

<strong>Axiant Action</strong>

64.    In the context of a civil action styled Cheryl Rose, Receiver v. Connell Loftus, *et al.* (In re: Mann Bracken LLP), the Receiver initiated a lawsuit within and under the umbrella of the Receivership Action (referred to herein as the "Axiant Action"), in which the Receiver asserted, *inter alia*, claims against Axiant and other defendants (the other defendants are referred to as the "Accretive Defendants").

65.    In the Axiant Action, Mann Bracken sought damages against Axiant for its negligence and breach in failing to perform its Collection Agency Services as required by law and the agreements: specifically, by failing to fully reimburse Mann Bracken amounts owed to it from the UAC's and Mann Bracken's collection efforts.

66.    After the Accretive Defendants and Axiant sought the removal of the Axiant action to Federal District Court for the District of Maryland, the District Court remanded the case to this Court. The Accretive Defendants filed a Motion to Dismiss. Mann Bracken filed a First Amended Complaint followed by another Motion to Dismiss filed by the Accretive Defendants.

67.    Axiant participated in the Axiant Action by either filing its own pleadings or joining in the filings by the Accretive Defendants.

**Notice of the Mann Bracken Claim**

68.    On December 24, 2009, Axiant filed schedules, under oath, stating that its liability to Mann Bracken was $8,874,593.

69.    On January 15, 2010, Mann Bracken filed its proof of claim for $8,874,593.00 in the Axiant bankruptcy proceeding pending before the United States Bankruptcy Court for the District of Delaware for services improperly rendered by Axiant.

70.    Prior to February 8, 2012, Axiant provided notice to ERII of its Wrongful Acts within the Policy Period.

71.    On February 8, 2012, ERII sent a reservation of rights letter without any specific reasons provided.  See Ex. 6.

72.    In February of 2013, ERII sent a letter to Accretive, LLC, not Axiant, providing ERII's reasons for denial of coverage to Axiant and misstating several operative facts.

73.    ERII did not send such letter to the Axiant Trustee.

74.    As a matter of Bankruptcy law, the Axiant Trustee was the proper, and only, legal representative of Axiant under 11 U.S.C. §323.

75.    As a result, ERII did not provide any defense to Axiant in the Axiant Action and Axiant defended the Axiant Action without ERII's involvement.

**Settlement Between Axiant and Mann Bracken**

76.    On April 29, 2013, Axiant and the Receiver were able to reach an agreement in principle regarding the resolution of all claims between them.  See Ex. 7.

77.    In order to eliminate the cost, burden and uncertainty of litigation and trial,

11

Axiant and Mann Bracken settled all of the Receivership Estate's claims against Axiant

on the terms and conditions which are summarized below.

A.      Axiant Consideration.

The Receivership Estate agreed that all documents, electronic
information and/or electronic storage media (collectively, "Confidential
Information") made available to the Receiver by the Trustee in the Axiant Action
would be destroyed with appropriate certification seasonably provided to the
Trustee confirming the destruction in accordance with the terms of a Consent
Order entered by the Axiant Bankruptcy Court. Notwithstanding the foregoing,
counsel may retain a copy of any document filed with the Court and any attorney
work product.

B.      Axiant's Consideration.

1.      Within ten (10) business days of receipt of a copy of the
Agreement executed by the Receivership Estate, Axiant through the Trustee filed
a motion and any required related pleadings seeking prompt authorization to enter
into the Settlement Agreement or the approval of the Agreement in the
Bankruptcy Court. The Bankruptcy Court granted approval.

2.      The Trustee, on behalf of Axiant, assigned to Mann
Bracken all right, title and interest in any and all claims against the Axiant
insurance carriers for any coverage any carrier has failed to provide to Axiant,
and/or its directors and officers, relating to claims which have been or might have
been made by Mann Bracken (without the Trustee being expected to make any
representations regarding either the propriety of the claims or the extent of
coverage, if any).

3.      The Trustee, on behalf of Axiant, assigned to Mann
Bracken all right, title and interest in the claim or claims of the Trustee against
Target Corporation, Target National Bank and Independence Receivables Corp,
the right to the collection of which is a matter of dispute between the Trustee and
the Receiver.

4.      The Trustee, on behalf of Axiant, assigned to the
Receivership Estate all right, title and interest in any other claims the Trustee has
not collected as of the date of the filing with the Bankruptcy Court of the Trustee's
final report, the right to the collection of which is, as of the date of the Agreement,
a matter of dispute between the Trustee and the Receiver.

5.      The Trustee, on behalf of Axiant, waived any claim to the
proceeds of any vehicles sold by the Receiver on behalf of the Receivership

Estate, the right to which is a matter of dispute between the Trustee and the Receiver.

6.     The Trustee, prior to the termination of services with Apto and/or related service provider(s), shall, without assuming any financial responsibility in this regard, cooperate and provide such non-monetary support so as to assure continued access by the Receiver to the databases currently maintained on behalf of the Trustee until the latter of the Receiver's certifying in writing that access is no longer required or receipt by the Trustee of certification from the Receiver that the Confidential Information has been destroyed pursuant to Paragraph 2.2.

C.     Joint Obligations of Mann Bracken and Axiant.

1.     Mann Bracken, by and through the Receiver, and the Trustee agreed that Mann Bracken shall hold a liquidated, general unsecured claim against Axiant in the amount of $13,400,000.00 which the Receivership Estate shall be afforded without setoff or credits in the Axiant Bankruptcy and subject only to objection by third parties.

2.     The Parties agreed to cooperate fully and in good faith to seek and obtain promptly any necessary court authorizations and approvals of the Agreement and/or settlement in both the Receivership Court and the Bankruptcy Court.

D.     Releases.

Except for the rights, duties and obligations set forth in the settlement agreement between Mann Bracken and Axiant and the Consent Order previously entered by the Bankruptcy Court on September 22, 2010, and authorized by the Bankruptcy Court and the Circuit Court, Mann Bracken and Axiant released claims against each other.

See Ex. 7.

78.     On or about August 12, 2013, Axiant and Mann Bracken entered into a settlement agreement containing the terms described above, but contingent upon approval of the Axiant Bankruptcy Court and this Court.

79.     On October 17, 2013, this Court approved the motion to approve compromise between Axiant and Mann Bracken. DE 932.

80.     On October 22, 2013, the Bankruptcy Court approved the motion to approve compromise between Axiant and Mann Bracken.  See Ex. 7.

13

81.     Under the Settlement Agreement, Axiant assigned all rights, title and interest in the Policy to Mann Bracken effective upon the Bankruptcy Court's and this Court's approved of the Settlement Agreement which both had occurred by October 22, 2013. See Ex. 7.

82.     Once the Bankruptcy Court and this Court approved the compromise between Axiant and Mann Bracken, ERII became liable to pay the damages incurred by Mann Bracken up to the Policy limits.

83.     ERII has failed to pay any of Axiant's liability to Mann Bracken.

### Bad Faith Conduct by the Defendant

84.     During the administration of this Estate, ERII did not disclose its inherent conflict of interest to the Receiver.

85.     Federal Insurance Company ("Federal"), issued Chubb Pro Lawyers Professional Liability Policy No. 8210-1960 ("Mann Bracken Policy") for the Policy Period May 23, 2009 to May 23, 2010 having a policy limit of Five Million Dollars ($5,000,000.00).

86.     Chubb is the sole owner of Federal. Ex. 2

87.     Federal owns a division known as "Chubb & Son."

88.     Chubb & Son, a member of Chubb, serves as the Claims Manager for ERII.

89.     ERII is a subsidiary of Chubb.

90.     On November 17, 2009, James P. Biondolillo, Assistant Vice President and Senior Claims Examiner for Chubb, wrote to Mr. Loftus explaining Federal's understanding of serious claims by and among third parties against Mann Bracken, Axiant and the Accretive Defendants in a multi-district litigation class action suit in the

14

United States District Court for the District of Minnesota, Case No. Civil No. 09-1939

(PAM/JSM) by several account debtors of Clients who were determined to owe debts to

the Clients by the National Arbitration Forum (the "NAF Litigation"). This appeared to

be a significant claim under which Mann Bracken would be liable and which Federal

wanted to limit its liability under the Mann Bracken Policy

91.    In a 13 page single spaced detailed letter, Federal and Chubb described all

of Federal's rights under the Mann Bracken Policy but failed to mention that Chubb was

the Claims Manager for ERII which was potentially liable to Mann Bracken under the

Policy.

92.    On March 10, 2010, Counsel for Federal ("Troutman Sanders") wrote a

four page letter explaining Federal's position regarding the defense of claims against

Mann Bracken under the Mann Bracken Policy. Ex. 14.

93.    In early June, 2010, the Receiver was suspicious about Federal's

motivations due to unusual questions and conduct directed towards the Receiver's

counsel in the NAF litigation involving the Accretive Defendants and the cross claim of

Mann Bracken.  Also, the Accretive Defendants refused to disclose the name of their

insurer in the NAF litigation.

94.    The Receiver was also suspicious about a question from Federal's counsel

asking why Mann Bracken was not in bankruptcy.

95.    On or about June 14, 2010, the Receiver inquired of Chubb and Troutman

Sanders whether there was a relationship between Federal or Chubb, the Insurer's for

Mann Bracken, and others in the NAF Litigation.

96.     Troutman Sanders, as Counsel for Federal, represented to the Receiver there was no relationship.

97.     On June 15, 2010, Troutman Sanders informed Counsel for the Receiver that Troutman Sanders was mistaken in its representation to the Receiver on the prior day.  Rather, Troutman Sanders disclosed that *Troutman Sanders*, not Federal or Chubb, represented the Accretive Defendants.

98.     There was no mention that the Claims Manager of ERII (Chubb) was Troutman Sanders's client, and ERII was liable under the Policy for Wrongful Acts by Axiant that harmed Mann Bracken.

99.     On June 21, 2010, Mann Bracken wrote its concerns about conflicts of interest to Troutman Sanders without knowing that the Claims Manager of ERII, who was liable to Mann Bracken under the ERII Policy, was also Mann Bracken's insurer under the Mann Bracken Policy.

100.    The Receiver requested a disclosure as to what efforts, such as a "Chinese Wall," that Troutman Sanders would implement to ensure that information about Mann Bracken's seemingly largest asset, its claim against the Accretive Defendants, would not be inadvertently leaked to Troutman Sanders' other clients, the Accretive Defendants.

101.    On June 22, 2010, Federal and Chubb, communicating through Mr. Biondolillo, were extremely angry, agitated and commenced yelling at Counsel for the Receiver for requesting a statement how Troutman Sanders would protect Mann Bracken from inadvertently disclosing information to the Accretive Defendants.  Mr. Biondolillo threatened to withdraw all coverage under the Mann Bracken Policy for a lack of "cooperation."

16

102.    On June 25, 2010, Federal and Chubb responded through Mr. Biondolillo in an attempt to justify Troutman Sanders legal representation, but he omitted Chubb's simultaneous relationship to ERII.

103.    Federal and Chubb continued their deceitful conduct through sending multiple communications to the Receiver and her NAF Litigation counsel and general counsel with a demanding and threatening tone and delaying payment on invoices for months to the Receiver's NAF Litigation counsel.

104.    On July 13, 2010, the Receiver responded to Federal and Chubb through Troutman Sanders clarifying the misstatements of Federal and Chubb in prior communications and requesting that Mr. Biondolillo cease communicating with the Receiver's counsel without the benefit of Federal and Chubb's own counsel.

105.    On July 14, 2010, Mann Bracken stated that Chubb was acting in an adversarial manner to Mann Bracken without even knowing that Chubb was the Claims Manager for ERII who was insuring Axiant, the entity that admitted owing Mann Bracken more than $8,874,000 due to Axiant's negligent performance of insured services.

106.    On July 19, 2010, Troutman Sanders responded to Mann Bracken's letter dated July 14, 2010, citing its defense in the *Yeado* case as an example of cooperation. The deceit of Chubb with respect to *Yeado* is described below.

107.    Since June 21, 2010, the relationship between Chubb and the Receiver has been difficult and at times hostile which necessitated at a mediation in California that Mr. Biondolillo and Counsel for the Receiver be placed in separate rooms despite both appearing on behalf of the financial interests of Mann Bracken.

108.    The Receiver learned that, at a later mediation between Axiant and the Accretive Defendants, Mr. Biondolillo attended and negotiated a very favorable settlement for Axiant whereby the Accretive Defendants paid Axiant approximately $1,500,000 for avoidable transfers.  Such information was not disclosed by Federal or Chubb to the Receiver.

109.    The strained relationship between the Receiver, on the one hand, and Federal and Chubb, on the other, manifested itself in other ways.

110.    In December of 2011, the Receiver received an offer of settlement with Bank of America that would provide substantial assets to the Estate provided Mann Bracken's insurer was willing to pay $10,000 to the Bank of America as part of the settlement under the Mann Bracken Policy and under which Federal had undertaken ongoing defense costs of tens of thousands of dollars.  The offer required a response within days.  Troutman Sanders informed the Counsel for the Receiver that Mr. Biondolillo had to approve of the compromise and that he would not be available for approximately two (2) weeks due to the Holidays.

111.    On March 10, 2010, Federal requested, through Chubb, that Mann Bracken consent to provide coverage to defend a seemingly small claim by Ms. Yeado ("*Yeado*") under the Mann Bracken Policy.  Specifically, Cathy Simon, Esq. of Troutman Sanders, and the lead attorney for Federal in its communications with the Receiver, extended an offer by Federal/Chubb to permit the Receiver to receive a credit of $75,000 against the Mann Bracken Policy to defend a claim that the Receiver did not intend to defend.  Similarly, Chubb requested that the Receiver consent to the same treatment for a few

other cases.  In the spirit of cooperation and at the specific request of Troutman Sanders, the Receiver agreed to have Chubb defend the *Yeado* litigation.

112.   After incurring hundreds of thousands of dollars under the Mann Bracken Policy defending the *Yeado* litigation, the Receiver learned more than two (2) years later that the attorney representing Mann Bracken and receiving hundreds of thousands of dollars for defending the *Yeado* case was Ms. Simon's husband who has a different last name.  This relationship was not disclosed to the Receiver and, in retrospect, appears punitive towards Mann Bracken and the benefits it would have available under the Mann Bracken Policy for its creditors.

113.   Chubb has acted with malice and ill will towards Mann Bracken since June 21, 2010.

114.   ERII is responsible for the misconduct of its agent, Chubb, who has acted as ERII's Claims Manager and which was intentionally unresponsive to Mann Bracken's claim against Axiant which was the subject of the Policy.

115.   The actions of ERII, by virtue of Chubb, its Claims Manager, constitute a breach of the implied covenants created under the Policy.

116.   As a result of ERII's breach of the Policy, Axiant and Mann Bracken suffered damages in the form of economic losses.

117.   Axiant has suffered damages as a result of ERII's misconduct, which damages Axiant assigned to Mann Bracken through the Settlement Agreement.

**Count I:**
**Direct Action Against Insurer**

118.   Mann Bracken incorporates by reference and realleges all paragraphs previously alleged herein.

19

119.   On October 22, 2013, the liability of Axiant was established by the orders of the Bankruptcy Court and this Court.

120.   The bankruptcy of Axiant and the Bankruptcy Court's Order Granting Cheryl E. Rose, Receiver for Mann Bracken, LLP Relief from the Automatic Stay to Proceed Against the Estate of the Debtor to Recover Available Insurance Proceeds Order prevents further execution against Axiant's assets.

121.   Md. Code Ann. Ins. Art. §19-102(b) ("Statute") provides that if an injured person is unable, after execution on a final judgment entered in an action against an insured, to recover the full amount of the final judgment, the person may bring an action against the insured's insurer in accordance with the terms of the policy for the lesser of the amount of the judgment recover in the action against the insured or the amount of the policy.

122.   The Statute permits Mann Bracken to enforce the Settlement Agreement against the Insurer in an amount not to exceed the Policy limits.

123.   The primary purpose of the Statute is to protect the public.  See Code 1957, art. 48A, §§ 384B, 481.

124.   Common law permits Mann Bracken to enforce the Settlement Agreement against the Insurer in an amount not to exceed the Policy limits.

125.   Mann Bracken has made demand on ERII to pay the amount owed under the Settlement Agreement which has been approved by the Bankruptcy Court and this Court.

126.   ERII has not made any payment under the Policy to Mann Bracken.

WHEREFORE, ERII, under the insurance policy issued to Axiant, and assigned to Mann Bracken, is obligated to assume up to the limits of its policy to Axiant the primary responsibility for Axiant's liability to Mann Bracken in the amount of Thirteen Million Four Hundred Thousand Dollars ($13,400,000.00); and Mann Bracken is entitled to such other and further relief as the case may require

## Count II:
## Breach of Contract

127. Mann Bracken incorporates by reference and realleges all paragraphs previously alleged herein.

128. At the time of the incidents described above resulting in significant losses to Mann Bracken, Axiant had in effect the Policy of liability insurance issued by ERII the terms of which provide coverage to those entities whom Axiant served, and ERII was obligated to afford a defense to Axiant to the action instituted by Mann Bracken and to satisfy any judgment obtained against Axiant as a result of the negligent performance of services by Axiant to Mann Bracken within the limits of said Policy.

129. Under the express terms of Policy, Axiant, the policyholder, is entitled to insurance coverage up to the policy limits.

130. By its conduct, including the failure to defend and to communicate with Axiant in response to a demand for insurance coverage, ERII deprived Axiant of the benefits of the Policy.

131. Although Axiant repeatedly called upon ERII to afford a defense, and undertake its obligations as primary insurer to Axiant in the suit by Mann Bracken, ERII has failed to do so.

21

132.   On February 8, 2012, ERII agreed to handle the matter for Axiant under the Policy.

133.   ERII did not attempt to communicate with Axiant after February 8, 2012. Further, ERII did not undertake the defense of the Axiant Action as it was obligated to do.  Finally, ERIII has not paid any of the Policy to Mann Bracken after October 22, 2013, when it was obligated to do so since Axiant's liability to Mann Bracken was established by both the Bankruptcy Court and this Court.

134.   As a result of ERII's breach of the Policy, Axiant suffered damages in the form of economic losses equal to the amount of coverage under the Policy.

135.   Mann Bracken is the assignee of Axiant with respect to the Policy and Mann Bracken is entitled to enforce the terms of the Policy.

136.   Mann Bracken is therefore entitled to all damages caused by such breach of contract, including consequential damages, incidental damages, and costs incurred.

WHEREFORE, ERII, under the insurance policy issued to Axiant, and assigned to Mann Bracken, is obligated to assume up to the limits of its policy to Axiant the primary responsibility for Axiant's liability to Mann Bracken in the amount of Thirteen Million Four Hundred Thousand Dollars ($13,400,000.00); and Mann Bracken is entitled to such other and further relief as the case may require.

### COUNT III
### Contract – Implied Covenant of
### Good Faith and Fair Dealing

137.   Mann Bracken incorporates by reference and realleges all paragraphs previously alleged herein.

22

138.   In Maryland, the implied covenant of good faith and fair dealing is recognized as part of an action for breach of contract, but not as an independent tort. *Mount Vernon Props., LLC v. Branch Banking & Trust Co.*, 170 Md. App. 457, 907 A.2d 373, 381 (Md.Ct. Spec. App. 2006).

139.   ERII has breached its duty of good faith and fair dealing owed to Axiant  in the following respects:

A.     Failing unreasonably and in bad faith to make benefit payments to Mann Bracken for the benefit of Axiant at a time when ERII knew that Axiant and Mann Bracken were entitled to those benefits under the terms of the Policy since Mann Bracken was the primary entity served by Axiant in the performance of its principle business activities and that Axiant was liable to Mann Bracken for any damages Mann Bracken incurred as a result of the Wrongful Acts of Axiant;

B.     Unreasonably delaying payments to Mann Bracken in bad faith, despite ERII's knowledge that Axiant's and Mann Bracken's claim for benefits under the Policy were valid, in that ERII knew that Axiant was an insured under the Policy, that Mann Bracken was receiving Collection Agency Services from Axiant, and that Axiant was liable under Axiant's Policy to Mann Bracken for any damages Mann Bracken incurred as a result of the Wrongful Acts by Axiant;

C.     Unreasonably failing to respond to provide to Axiant the benefits provided under the Policy;

D.     Failing to reasonably and promptly investigate and process Axiant's claims for benefits under the Policy, in that ERII in the exercise of reasonable diligence should have known, and did know by virtue of its Claims Manager, that Axiant

23

was an insured under the Policy, that Mann Bracken filed suit against Axiant and that

Axiant was liable to Mann Bracken for damages to the extent, at least, admitted in the

Axiant bankruptcy schedules;

       E.      Failing to make a good-faith effort to obtain a prompt, fair, and

equitable settlement of Mann Bracken's claim for damages against Axiant under the

Policy for the benefit of Axiant; and

       F.      Mann Bracken is informed and believes, and on the basis of such

information and belief alleges, that ERII has breached its duty of good faith and fair

dealing owed to Axiant by other acts or omissions of which Mann Bracken is at present

unaware, which will be shown according to proof at the time of trial.

      140.   ERII, through Chubb, acted in an outrageous manner and with malice or

willful or wanton conduct towards Mann Bracken as described above which resulted in

the Insurer failing to defend Axiant, failing to pay Mann Bracken's claim for Axiant and

failing to pay Mann Bracken after entry of the Settlement Agreement.

      141.   ERII interfered with Axiant's ability to exercise its rights under the Policy

by failing to pay the settlement amount established under the Settlement Agreement.

      142.   As a proximate result of the unreasonable and bad faith conduct mentioned

above, Axiant remains liable to Mann Bracken for economic and consequential damages

in an amount of Thirteen Million Four Hundred Thousand Dollars ($13,400,000.00).

      143.   Axiant assigned the benefits under the Policy to Mann Bracken.

      144.   Mann Bracken is therefore entitled to all damages caused by such breach of

implied covenants, including consequential damages, incidental damages, and costs

incurred to the Policy limits.

WHEREFORE, ERII, under the Policy issued to Axiant, and assigned to Mann Bracken, is obligated to assume up to the limits of its Policy to Axiant the primary responsibility for Axiant's liability to Mann Bracken in the settled amount of Thirteen Million Four Hundred Thousand Dollars ($13,400,000.00); and Mann Bracken is entitled to such other and further relief as the case may require.

Dated: March __, 2015                          Respectfully submitted,

                                               OFFIT KURMAN, P.A.

                                               James M. Hoffman, Esq.
                                               William H. Pillsbury, Esq. (licensed in PA)
                                               4800 Montgomery Lane, Suite 900
                                               Bethesda, MD 20814
                                               (240) 507-1710
                                               (240) 507-1735
                                               jhoffman@offitkurman.com

                                               Counsel for the Receiver for Mann Bracken,
                                               LLP, Cheryl E. Rose

4842-1680-0034, v. 1

25